**Lee TENNEY, Plaintiff,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.**

**No. G87–561 CA7.**

United States District Court,
W.D. Michigan, S.D.

March 3, 1988.

Timothy J. Bott Law Offices, P.C. by Frederick W. Bleakley, Jr., Muskegon, Mich., for plaintiff.

John A. Smietanka, U.S. Atty. by Michael L. Shiparski, Asst. U.S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health and Human Services denying plaintiff's claim for a period of disability and disability insurance benefits.

■ The final decision of the Secretary is now before the Court for review pursuant to motions for summary judgment filed by both plaintiff and defendant. Section 205(g) of the Act, *supra,* limits the Court to a review of the administrative record and provides that if the Secretary's decision is supported by substantial evidence it shall be conclusive. The Secretary has found that plaintiff is not disabled within the meaning of the Act. The only issue before the Court is whether or not the decision of the Secretary is supported by substantial evidence. Because the Court finds that it is not so supported, plaintiff's motion for summary judgment is granted.

Plaintiff was born on May 2, 1944 and has a twelfth grade education. (Tr. 35–36). He has relevant work experience as a fruit exchange worker, scrap metal worker, and a general laborer. Plaintiff has not worked since at or around November of 1984. Plaintiff claims disability due to his possible chronic obstructive pulmonary disease and a psychiatric bipolar disorder. (Tr. 34–35). The Administrative Law Judge (ALJ) concluded that plaintiff retained the residual functional capacity to do past relevant work. This decision became the final determination of the Secretary when the Appeals Council denied plaintiff's request for review on May 14, 1987.

Plaintiff applied for disability benefits on February 11, 1985. His claim was denied initially and upon reconsideration. (Tr. 59). Plaintiff requested and was granted a hearing before an ALJ. That hearing was held November 10, 1986 before ALJ Earl J. Meisenbach. Plaintiff was represented by counsel at the hearing. (Tr. 31).

Plaintiff had an opportunity to testify at the hearing. Although there was some confusion over his last day of employment, plaintiff did claim that he was fired for missing too much time due to his breathing difficulty. He believed that he could return to work on a hi-lo machine. He claims he had stopped smoking one year ago, but was bothered by persistent chest pains caused by heavy lifting. In addition, plaintiff was taking medication for his athletes foot, and had pressures in his groin area. When asked about the amount of time plaintiff was missing from work, plaintiff responded, "I was sick and I had a cold and one day the car broke down and it was eight miles from town, I couldn't walk that far you know." (Tr. 37, 46–47, 52, 55).

In addition to the alleged physical difficulties, plaintiff made reference to some of his nonexertional causes for losing his job. Plaintiff got jumpy at work. He did not like getting scolded for something he claims he did not do. He had a tendency to blow up, holler, and scream. He has not been in a work environment since he was last hospitalized, and has had no more occasions to blow up, except with his wife. He believes he is less assaultive and aggressive because he stays away from people who are bothering him. He feels he will probably blow up again if he is put back in a work setting. He just cannot help but yell back. (Tr. 54–58). In addition, difficulties with concentration prevent him from continuing one task for more than a couple of hours. (Tr. 59).

Plaintiff described a typical day as arising at seven, feeding and dressing himself, taking his medication for his feet, and getting his daughter ready for school. He watches television, does the dishes, visits, and occasionally rests. He is in bed by 9 p.m. (Tr. 38–39, 45–46). He believes he can lift twenty pounds, walk two blocks, sit for one-half hour, stand for forty-five minutes, climb a flight of stairs, and drive a car. However, he partakes in no hobbies or clubs, except for occasional fishing and deer hunting. (Tr. 40–44).

He admitted to the ALJ that he had had trouble with the law. He explained that at that time he had been depressed, divorced, and drank a lot. He claims he was locked up in the State Hospital two years ago for "[the police] told me I was bothering them much. I was trying to help them find people using drugs and stuff like that, and I kept trying to report them, but they wouldn't listen to me and believe me, you know, they thought I was harassing them too much. They just put me up there." (Tr. 48). Plaintiff testified that he was not currently on any medication for his mental problems.

A summary of the medical evidence is as follows: Relating to plaintiff's complaints of an exertional impairment, the only evidence presented were negative test results for active cardiopulmonary abnormalities; negative EKG results; and Dr. Chusid's belief that there was no cardiomegaly present. As for the diagnosis of chronic obstructive pulmonary disease, the degree of such disease was unknown. The only other physical condition is athletes foot, for which plaintiff takes a prescribed medication. The ALJ reviewed the foregoing evidence and concluded that plaintiff was not significantly limited by these conditions in his ability to perform work activity. Therefore, these impairments were not considered severe. This part of the ALJ's determination is amply supported.

However, the ALJ's conclusion as to the extent of plaintiff's mental impairment is another story. The first time plaintiff was involuntarily committed to a State mental hospital was in September of 1971 in Traverse City. Plaintiff had tried to hang himself in the local jail. He was in jail because he allegedly tried to kill people, including his wife and children. While in the Traverse City State Hospital's care, plaintiff suffered some rather severe side reactions to psychotrophic medications. It

was reported that plaintiff had had a long history of abuse towards his family and community. His resistance to following authority cost him a job. Plaintiff had gone as far as to develop delusional ideas that he was an undercover agent for the Detroit Police Department.

In light of these delusional ideas and threats, plaintiff was diagnosed with paranoid schizophrenia, a mental disorder of considerable severity in which the patient exhibits delusions of grandeur and/or persecution. The secondary diagnosis was that of personality disorder of an explosive and severe nature. When the manifestations of psychotic or socio-pathic manner subsided, plaintiff was discharged. He was given a poor prognosis and it was recommended that he receive outpatient care at Mason County Community Mental Health Services (MCCMHS). Such care was never sought by plaintiff until 1974.

MCCMHS diagnosed plaintiff with a fairly severe personality disorder. This diagnosis was based on plaintiff's severe feelings of inadequacy, powerlessness, and social alienation. He attempted to control these symptoms with repression and alcohol. After two sessions, he withdrew from the service. (Tr. 205).

In January of 1977, for reasons that are not altogether clear, plaintiff was admitted to the Muskegon County Community Mental Health Services Center at the request of the Ludington Police Department. Plaintiff was not committed for "it was found that Mr. Tenney did not meet the requirements of a person needing hospitalization[.]" (Tr. 160).

Four months later in May, plaintiff was involuntarily committed to the Center for Forensic Psychiatry in Ann Arbor. Plaintiff was adjudicated incompetent to stand trial for a larceny charge stemming from an attempt to steal theatre tickets. He explained to the counselors at the Center that

> he saw a "ray of light" while walking on Elizabeth Street in Detroit, shortly before his incarceration in jail. This ray of light was quite alarming to him and different in that it appeared "in a straight line". Further elaboration on this line of thinking linked the ray of light with a hypodermic needle, which supposedly was somehow used to inject some form of substance, or poison as he referred to it, in milk. He claimed to have the ability to ascertain which of the milk cartons were tampered with by the "brown spots" which are found on the carton. (Tr. 174).

Plaintiff also indicated to Robert Racine, certified forensic examiner, and William C. Yaroch, M.D., that plaintiff was "hearing voices which said 'go get the FBI.'" (Tr. 164). Racine and Yaroch opined that plaintiff's thinking was disorganized.

Plaintiff improved markedly over the following month. At one point he was considered amenable and cooperative, and his interactions were appropriate. His comments were more spontaneous and organized. At this point, it was decided that plaintiff was competent to stand trial. It was recommended, however, that plaintiff stay on his prescribed Loxitane and Artane throughout the judicial proceedings. In his discharge note, it was stressed that plaintiff's improvement followed the administration of antipsychotic medication. He had been diagnosed with severe paranoid psychotic illness. (Tr. 165–71).

Plaintiff returned to MCCMHS in January of 1978. He informed the agency that it was part of his probation that he seek treatment. Plaintiff was no longer taking any psychotrophic medication. His primary complaint was that of nervousness and difficulty finding a job. (Tr. 206–07). By April, plaintiff was seeking voluntary admission into the Traverse City Regional Psychiatric Hospital after having tried to commit suicide by standing in the road. Plaintiff had symptoms of depression with suicidal thoughts and was diagnosed with depressive neuroses, a functioning disease of the nervous system resulting in impairment of judgment and rational thinking. Plaintiff was discharged the following month. Plaintiff returned to MCCMHS for one more session before withdrawing from their services. (Tr. 207).

Then in 1984, plaintiff walked into the Ludington Police office with a large filet knife, stating that he wanted to kill himself. Plaintiff was transferred to the Memorial Medical Center and hospitalized for four days. He was placed on medication and returned to outpatient care at the Mason County agency. Plaintiff went to the agency once and they indicated he would no longer continue medication. (Tr. 207).

The final involuntary admission of record was in January of 1985. Apparently, there had been continuing reports of spousal abuse. Plaintiff was diagnosed with a major affective disorder, manic phase, manifested by hyperactivity, hypervolubility, agitation, labile moods, delusions involving superior powers and the FBI, and high levels of anger, hostility, and irritability. The affective disorder was further described as bipolar disorientation. He was not discharged until his behavior was more alert and pleasant, he was more oriented, his moods were more stable, and his anger diminished.

Interestingly, the Traverse City hospital noted plaintiff's great reluctance to take medication, in part possibly due to his allergic reactions in the past. Close follow-ups were recommended until remission had stabilized. His long-term prognosis was "guarded." He spent three months at the hospital. As late as February of 1985, it is noted that plaintiff was not attending his problem solving groups due to disruptive behavior. Plaintiff was demanding of others and always commanding them to do things.

A vocational assessment was done by MCCMHS in March of 1985. Judging by plaintiff's work history, it appears as if plaintiff possesses general work skills and the ability to be employed when psychotic symptomology is in control. However, it was considered that plaintiff was not sufficiently stabilized at the present and that he also needed medication and counseling. Because his compliance with medication was seen as marginal at best, his prognosis was considered somewhat questionable. In sum, considering plaintiff's long-term history of mental disease, his inability to take medication, his strained interpersonal relationship skills, and his bipolar affective disorder-manic, and only partial remission, plaintiff had little capacity to engage in competitive employment at that time. (Tr. 180–212).

A psychiatric medical report was performed by the Michigan Disability Determination Service, Dr. Das, specifically. Plaintiff was diagnosed with R/O bipolar disorder, borderline personality, long history of alcohol abuse and acting out behavior, and psychosocial stresses to the moderate extent. His highest level of adaptive functioning in the past year (the report dated April 1986) was poor. It was believed that plaintiff would have a problem handling his funds.

A second consultative exam had taken place a year earlier by a Dr. Raju. He indicated that plaintiff felt his major problem was shaking of his hand, and that it gave out on occasion. Dr. Raju's impression was that plaintiff was in contact with reality, pleasant and cooperative, did not aggravate or minimize his symptoms, had a good ability to organize his thoughts, had no delusions or hallucinations, no suicidal thoughts at the present time, was oriented to time, place, person, situation, had some difficulty in memory, had fair fund of general knowledge, and had difficulty with calculations. He diagnosed plaintiff with bipolar disorder by history in remission. His prognosis was fair to good in view of the fact that there were only two episodes of bipolar disorder within a ten to thirteen year interval. He felt plaintiff could handle his insurance benefit funds. (Tr. 224–27).

Dr. Huizenga performed a psychiatric review of plaintiff in May of 1986. He opined that an RFC assessment was necessary. Plaintiff suffered from personality disorder, major bipolar and in partial remission, along with substance addiction to alcohol, of an episodic nature. As far as plaintiff's mood disturbances, plaintiff was diagnosed as having depressive syndrome manifested by loss of interest, sleep disturbance, agitation, decreased energy, and difficulty concentrating. He also suffered from manic syndrome, as manifested by

hyperactivity, pressures with speech, and inflated self-esteem, decreased need for sleep, involvement in activities with a high probability of painful consequences, and hallucinations. He was also diagnosed with bipolar syndrome. Under his personality disorder assessment, the doctor noted oddities of thought, intense and unstable interpersonal relationships, and impulsive, damaging, and antisocial behavior. His substance addiction disorder was most closely applicable to this personality disorder.

Most interestingly, the doctor considered that the presence of the Affective Disorders and their attendant manifestations placed on plaintiff only a slight degree of limitation in his restrictions of daily living. There was only slight difficulty in maintaining social functioning, according to the doctor. And deficiencies of concentration or failure to complete tasks seldomly occurred. Episodes of deterioration of decompensation in the work or work-like settings were indicated as happening only once or twice. (Tr. 71–78). In sum, it was Dr. Huizenga's opinion that neither plaintiff's Affective Disorder nor his substance addiction met the Listings.

A second psychiatric review was undertaken by Dr. Crager in July of 1986. Again, the doctor felt it was necessary for the ALJ to determine plaintiff's residual functional capacity because plaintiff's condition did not meet the Listing. This psychiatrist found personality disorder only. He found symptoms of paranoid schizophrenia and bipolar manic that were not present on the date of the review. Now plaintiff only had a mixed type personality disorder. What he found were persistent disturbances of mood or effect, pathological dependence, passivity, or aggressiveness; and intense and unstable interpersonal relationships within compulsive and damaging behavior. The degree of limitation on plaintiff's daily living were given similar assessments as with Dr. Huizenga.

There is one other interesting piece of evidence in the record and that was done by SSA interviewer Ruez. At page 133 in the record, it is noted that during the initial contact interviews, plaintiff avoided answering all questions about his mental condition and how it affects him. This appears to be rather consistent with plaintiff claiming that his major problems were physical and not emotional in nature.

Basically, the ALJ decided that plaintiff retained the residual functional capacity to do past relevant work. Employment as a fruit exchange worker, scrap metal worker, and general laborer were not precluded by his physician or mental condition. Because plaintiff was capable of caring for his personal needs, socializing with friends, willing to work as a hi-lo driver, and able to climb stairs, he was not disabled.

The ALJ considered plaintiff's mental condition severe. He repeated how in 1971, plaintiff was considered assaultive; in 1974 it was thought that plaintiff had severe underlying personality disorder; since 1977 plaintiff was diagnosed as having paranoid ideations and grandiose delusion; symptoms of depression were found in 1978; there were suicidal ideations and depression in 1984; and in 1985 it was assessed that plaintiff had major affective disorder, manic phase. However, the ALJ went on to state that plaintiff no longer needed assistance in his daily living skills. Plaintiff's mood was in good control with medication. Plaintiff's bipolar affective disorder was in partial remission.

The ALJ concluded that since plaintiff was currently in remission in light of his medication, there was only a slight restriction in his daily living. As long as plaintiff was not placed in a highly stressful, nonroutine work situation, he could be employed. He was a good candidate for low stress, routine task situations. Since, the ALJ continued, all plaintiff's prior jobs were low stress in nature, he could perform past relevant work.

The Secretary's determination that plaintiff's present mental condition is sufficiently under control to perform past relevant work ignores a long history of emotional illness. The ALJ focused on the more recent reports of consultative examiners who believed that in light of medication and low stress employment, plaintiff was fine. The ALJ may have made mention of plaintiff's prior mental history in his determination, but in effect he fails to adequately consider

it. Although plaintiff has made a continuing effort to engage in employment (see Tr. p. 108), plaintiff has been able to maintain these jobs for only short periods of time. As testified, plaintiff lost one of his more lengthy jobs due to his uncooperative and rather explosive behavior. Apparently, plaintiff is not able to control his stress even in these "low-stress" positions.

In addition, the consultative examinations took place over a series of hours with each reviewer. The other medical reports trace plaintiff's condition usually over a series of days or months. It is not sufficient that the ALJ consider only discharge condition of a claimant. The ALJ must focus on the admitting reports as well. To do otherwise is to not consider the whole report, but only the half of the report that supports his conclusion. *See generally Ostrowski v. Heckler,* 609 F.Supp. 1109, 1114–15 (D.C.Ill.1985).

An ALJ must consider all relevant evidence, regardless of whether that evidence counters the ALJ's ultimate conclusion. This is what is meant by considering the evidence "taken as a whole." *Allen v Califano,* 613 F.2d 139, 145 (6th Cir.1980).

Viewing the record as a whole, it is inconceivable that anything but a finding that plaintiff's mental condition meets the Listings under 12.04 could be made. To do otherwise ignores years of recidivism, failed attempts at employment, and non-SSA employed psychiatric opinion. The record contains medical documentation of persistent depressive syndromes characterized by thoughts of suicide, hallucinations, delusions and paranoid thinking, sleep disturbance and psychomotor agitation. In addition, there has been found manic syndrome characterized by hyperactivity, inflated self-esteem, involvement in activities that have a high probability of painful consequences, and hallucinations, delusions, and paranoid thinking. Plaintiff has also been diagnosed with bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive symptoms.

More importantly, it is clear that the difficulty plaintiff has in maintaining social functioning in light of these depressive, manic, and bipolar syndromes is marked. In his testimony he claims that he rarely socializes. There is also evidence that over the years plaintiff has been troublesome in the community, and for the police department. And whereas plaintiff complains of having difficulty in concentration, there is an even stronger indication that plaintiff suffers from repeated episodes of deterioration or decompensation in work-like settings. Not only do we have his testimony going to his reactive behavior towards authority and instruction, we also have a work history inundated by job changes and unsettledness. I believe that plaintiff has amply supported a finding that he suffers from a severe impairment which meets the Listing under 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1, 12.04. The Secretary's determination that plaintiff's condition does not meet the Listings is clearly not supported by substantial evidence. Therefore, he is to be considered disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520(d).

Accordingly, the Secretary's decision is reversed, plaintiff's motion for summary judgment is granted, defendant's motion for summary judgment is denied, and the case is remanded for the award of benefits.